ALABAMA POWER CO. v. FEDERAL
POWER COMMISSION.
No. 7853.

United States Court of Appeals for the
District of Columbia.

Decided March 30, 1942.

Messrs. P. W. Turner and Walter Bouldin, both of Birmingham, Ala., with whom Messrs. H. Cecil Kilpatrick, of Washington, D. C., and William M. Moloney, of Birmingham, Ala., were on the brief, for petitioner.

Messrs. Wallace H. Walker, Assistant General Counsel, and Charles V. Shannon, both of the Federal Power Commission, with whom Messrs. William S. Youngman, Jr., General Counsel, and Stanley M. Morley, both of the Federal Power Commission, were on the brief, all of Washington, D. C., for respondent.

Before GRONER, Chief Justice, and MILLER and EDGERTON, Associate Justices.

MILLER, Associate Justice.

In 1921, the Federal Power Commission issued to the Alabama Power Company a license authorizing the construction of a hydroelectric project on the Coosa River, a navigable stream in the State of Alabama. Upon completion of the project the Company filed with the Commission, in 1930, a cost statement claiming $10,646,056.76 as the total cost of the project. After audit, hearings, and reconsideration following application for rehearing, the Commission, on December 19, 1932, found the cost to be $7,094,913.69, and ordered the Company to conform its accounts accordingly. In 1933, the Company filed suit in the District Court of the United States for the District of Columbia to enjoin enforcement of the Commission's orders. Following a trial on the merits, that court dismissed the bill of complaint. On appeal, the United States Court of Appeals reviewed the proceedings and contentions of the parties in extenso; affirmed the Commission's determinations and orders in part and reversed in part. By way of summary this court said: "We hold that the trial court correctly sustained the Commission's allowances for land, taxes and interest, and its refusal to allow the fee of the Dixie Construction Company. But we hold further that the trial court should have directed the Commission to consider the cost of the water right at Lock 15

and to have required the Commission to allow not merely the out-of-pocket cost of electric energy but the total cost exclusive of profit, and therefore to have required the Commission to determine whether or not the rate of 1.187 per k. w. h. included any element of profit. We further hold that since the case must be returned to the Commission in respect of the foregoing items, it would be proper for the Commission to allow the licensee further opportunity to introduce evidence of the cost of financing, engineering, and promotional services prior to 1913 included in the Power Company's claimed figure of $3,500,000. We therefore reverse the decree of the trial court with orders to direct the Federal Power Commission to proceed in accordance with this opinion."[1]

Pursuant to the court's direction, the Commission, between November 30, 1939 and January 9, 1940, held hearings on the remanded items and fixed the actual legitimate original cost of the project at $7,209,363.99; increasing its earlier determination in the following amounts: "* * * (1) $51,966.58 as the 'total cost exclusive of profit' of electric energy furnished by petitioner to the project during its construction; (2) $66,603.78 as the actual reasonable cost of this project's portion of the Lock 15 water right; and (3) $26,540.82 additional interest during construction." It found that the Company had presented no evidence of the cost of financing, engineering, and promotional services prior to 1913 and made no allowance therefor.

On this appeal, the first question presented for our decision is the cost of the water right at Lock 15. In Alabama Power Co. v. McNinch,[2] we said: "The Commission erred, however, in failing to consider the cost to the licensee of the water right owned by the Wetumpka Power Company at Lock 15, which was down-stream from Duncan's Riffle. No lands at Lock 15 are involved in the Mitchell Dam project and apparently the Commission for that reason failed to allow the cost of any water rights at Lock 15. The record shows, however, that the Wetumpka Power Company had the right under Alabama law to develop Lock 15 by a dam which would have impounded water to a height which would have flooded Duncan's Riffle, the present site of Mitchell Dam proper, to a depth of approximately 14 feet. The Mitchell Dam project therefore was erected in derogation of the water right of the Wetumpka Power Company at Lock 15, at least to this extent. The right of the Wetumpka Power Company passed to the licensee in the merger of 1913. The trial court should have directed the Commission to allow the introduction of evidence as to the cost to the Power Company in 1913 of the right of the Wetumpka Power Company to develop Lock 15 to an extent which would have made the Mitchell Dam project impossible, and to allow such cost as part of the original cost of the project."

Both parties now agree that the cost of the water right at Lock 15 should be measured by the market value of the securities issued therefor. They disagree as to how that market value should be determined. At the hearing before the Commission, the Company renewed its contentions—which were fully considered and rejected in our earlier opinion—as to the formula which should be used; and urges that we now abandon our earlier decision in favor of those contentions. Consistently with this steadfastly maintained position, the Company introduced evidence to prove the cost of the water right at Lock 15, in terms of values "not as an isolated project, but as part of the more efficient and valuable two dam development [Mitchell Dam and Jordan Dam]. * * * made possible by single ownership of all dam sites * * *." It insisted that the consideration paid for control of the water right at Lock 15 was in no way identical with the value of such water right when utilized at Mitchell Dam and Jordan Dam "in an economic two high dam development of the entire head in that stretch of the river." Its expert witness then set up as the "major factors which would determine the value of the water power sites * * *" reestablished "as of a 1913 point of view * * *" the following: "1. The market and the ability of the market to absorb the power. 2. The number and size of the new hydro plants to be brought in on the system, the available capacity, and the schedule of development of these sites which were already owned by the company. 3. The construction costs which would be incurred in the development of these hydro plants, and the associated op-

[1] Alabama Power Co. v. McNinch, 68 App.D.C. 132, 153, 94 F.2d 601, 622.

[2] 68 App.D.C. 132, 147, 94 F.2d 601, 616.

erating and annual carrying costs. 4. The cost of providing this power from the most effective alternative source. In this case that would be from steam plants. Consideration of the costs of power from alternative steam plants necessarily involves the determination of the capital cost of constructing such alternative steam plants, and the annual operating costs taking into consideration, the improvement in efficiency which could have been foreseen in 1913." His conclusion, as to the cost which should be allocated to Lock 15, is then summarized in petitioner's brief as follows: " * * * At this point, the witness exercised his expert judgment and opinion and stated that he would have advised the prospective purchaser that it would not be justified in paying more than one-half of the 1913 present worth of the sites, namely, for Mitchell $1,450,000; Jordan $2,300,000; Lock 14—$1,200,000; Lock 15—$750,000; Lock 18—$1,600,000. * * * The witness then used these last figures, representing his judgment or opinion, rather than any arithmetical calculation * * * in determining the value of the water rights at Lock 15 to the extent that the same contributed to the Mitchell Dam project. The excess value of Mitchell over Lock 14, or the value contributed to the Mitchell property by Lock 15, was determined on the basis of these figures to be reasonably worth to a prospective purchaser $250,000."

■ It will be seen from the foregoing statement of the Company's position that it failed to take advantage of the opportunity presented by our earlier decision, and elected, instead, to reopen large questions which were put to rest in that decision. It urges upon us at this time arguments supporting our power to reopen those questions. But we see no reason to do so. Moreover, we conclude that the Commission was justified, especially under the circumstances, in adopting, for its determination of the cost of the Lock 15 water right, the formula which it had used in determining the cost of other water rights, and which was approved by this court in Alabama Power Co. v. McNinch.[3]

■ No review is sought, on this appeal, of the Commission's allowance for the item of total cost, exclusive of profit, of electric energy furnished by the Company during construction of the project. The only remaining item remanded for consideration by the Commission concerned the cost of financing, engineering and promotional services prior to 1913, which was included within the Company's claimed figure of $3,500,000. As to this, although opportunity was given, no evidence was offered; consequently, we hold, as we did in our earlier opinion, that where the record shows no adequate basis for an estimate of such expenditures, and any estimate would be merely guesswork, the action of the Commission in refusing to make an allowance was proper.

On this appeal a number of additional questions are presented, which grow out of the Commission's order of November 26, 1940, requiring the Company to make specified accounting disposition of the allowed and disallowed items. These requirements are set out in the margin.[4] The Company contends that (1) its ac-

3 68 App.D.C. 132, 145, 147, 94 F.2d 601, 614, 616: "We think the theory in valuing Parcel 214 was correct. In finding what the value of the parcel was at the time of the merger the Commission based its conclusions upon the last transfer of the land prior to the merger. This had been through the purchase in 1912 by the Traction Company of all the stock of the corporation which then owned Parcel 214. The payment which the Traction Company made was composed in part of securities. The Commission reckoned these at market value, which had been stipulated. * * * To the extent that the water rights involved in the Mitchell Dam project had been acquired by the Power Company by filing plans, the rights cost the licensee nothing and the Commission properly allowed nothing. Parcel 214 at Lock 14, and Parcel 9 at Duncan's Riffle, however, were acquired by the licensee from a corporation and individuals interested in hydro-electric development. If any water rights attached to these parcels, the price paid for the acquisition of the land included the cost of the water rights to the licensee. The Commission's allowance of the cost of the land in Parcel 214 and Parcel 9, therefore, included the cost of the water rights if any. We think, therefore, that the Commission has made full allowance for the water rights at Lock 14 and at Duncan's Riffle."

4 "The Commission orders that: (A) The Licensee, Alabama Power Company, establish and maintain control accounts with reference to this project showing a total debit balance in its fixed capital accounts beginning with an entry of $7,-

counts, securities, books, rates and services are all regulated by the Alabama Public Service Commission; (2) the Commission's jurisdiction over the Company's accounts is limited to those matters in which it is not subject to regulation by the State Commission; (3) the Commission was without authority to order the disallowed items charged to the Company's surplus account; (4) the accounting disposition of the disallowed items was not an issue in this proceeding; (5) the Commission's order deprived the Company of its property without due process of law because it denied a hearing with respect to the accounting disposition of the disallowed items; (6) notice and opportunity of hearing is mandatory under the statute; (7) the Commission's order directing the Company to show cause in writing under oath why its order should not be made effective does not constitute the hearing to which the Company is entitled; (8) the Commission "has considered without notice, condemned without hear-

ing, found without evidence, and rendered judgment without trial."

In Alabama Power Co. v. McNinch,[5] we said, after setting out pertinent sections of the applicable statute: "Under these provisions it is clear that the Commission has authority to determine the actual legitimate original cost of a project and to require the licensee to set up his books showing the cost as thus determined." The Commission relies upon this language as constituting the law of the case and as justifying its order of November 26, 1940. That it does constitute the law of the case, in part at least, there is no doubt.[6]

The language of the statute and the clearly stated powers and duties of the Commission leave no doubt that, while a division of authority between it and appropriate state agencies is contemplated,[7] so far as concerns regulation,[8] the Commission is vested with summary and un-

---

209,363.99 ($7,094,913.69 previously allowed plus $114,450.30 now allowed in addition thereto) as the actual legitimate original cost of said project as of December 31, 1925;

"(B) The Licensee establish and maintain subsidiary accounts showing and substantiating all entries in such control accounts, and classifying the total for fixed capital in appropriate detail and in accordance with the provisions of the Commission's Uniform System of Accounts Prescribed for Public Utilities and Licensees, revised to December 31, 1936, pursuant to authority granted by the Federal Power Act;

"(C) The amount of $3,657,080.83, representing the total of all items disallowed, exclusive of $183,396.22, the disallowed part of claimed cost appertaining to water rights at Lock 15, be transferred from the project accounts and charged to the earned surplus account pursuant to and in accordance with the applicable provisions of said Uniform System of Accounts Prescribed for Public Utilities and Licensees;

"(D) The amount of $152,814.31 for organization expenses, the amount of $66,603.78 for the cost of the Mitchell Dam portion of the Lock 15 water rights, and the $969.97 for interest, allowed in addition to Licensee's original claimed cost shall be charged to the project accounts and the earned surplus account concurrently credited with the total of these items;

"(E) All amounts now carried in the asset accounts as part of the original

charges to the cost of the project up to and including December 31, 1925, and not otherwise disposed of by this order, and which do not represent the cost of some physical property other than this project, shall be transferred from such accounts, both control and subsidiary, in which included, and the net amount thereof charged to earned surplus account, pursuant to and in accordance with the applicable provisions of said Uniform System of Accounts;

"(F) Within sixty (60) days of service of this order, the Licensee comply with this order and execute and submit to the Commission FPC Form No. 76 showing such compliance."

[5] 68 App.D.C. 132, 137, 94 F.2d 601, 606.

[6] Brown v. Gesellschaft, 70 App.D.C. 94, 95, 104 F.2d 227, 228, certiorari denied 307 U.S. 640, 59 S.Ct. 1038, 83 L. Ed. 1521; Davis v. Davis, 68 App.D.C. 240, 243, 96 F.2d 512, 515, reversed 305 U.S. 32, 59 S.Ct. 3, 83 L.Ed. 26, 118 A. L.R. 1518; White v. Higgins, 1 Cir., 116 F.2d 312, 317; Toucey v. New York Life Ins. Co., 8 Cir., 112 F.2d 927, 928, reversed 314 U.S. 118, 62 S.Ct. 139, 86 L. Ed. —; Seattle v. Puget Sound Power & Light Co., 9 Cir., 15 F.2d 794, 795, certiorari denied 269 U.S. 565, 46 S.Ct. 24, 70 L.Ed. 414.

[7] Safe Harbor Water Power Corp. v. Federal Power Commission, 3 Cir., 124 F.2d 800, 806.

[8] Federal Water Power Act of 1920, 41 Stat. 1063, §§ 4(b) (e), 7, 9(b), 10(e), 14, 19, 20, 22, 27, 16 U.S.C.A. §§ 797(c,

limited powers over the accounts of its licensees to the extent necessary to insure proper performance of its duties.[9] If the State, in the proper performance of its duties, wishes to require the keeping of a separate set of books no doubt it can do so.[10] And if the Company wishes to keep a third set for its own purposes there seems to be nothing in the law to prevent it from doing so.[11] But two things are certain: (1) The statute clearly contemplates that the Commission may require the licensee to establish and maintain accounts; (2) the licensee must allow the Commission to have access to all accounts which it does keep. The Act of 1920 provides, generally, that the Commission shall have power "To perform any and all acts, to make such rules and regulations, and to issue such orders not inconsistent with this Act as may be necessary and proper for the purpose of carrying out the provisions of this Act."[12] Specifically, it provides that: " * * * The licensee shall grant to the commission or to its duly authorized agent or agents, at all reasonable times, free access to such project, addition, or betterment, and to all maps, profiles, contracts, reports of engineers, *accounts, books, records, and all other papers and documents* relating thereto."[13] [Italics supplied]

It empowers the Commission in express terms and without limitation (1) "To prescribe rules and regulations for the establishment of a system of accounts and for the maintenance thereof by licensees [t]hereunder;" (2) "to examine all books and accounts of such licensees at any time;" (3) "to require them to submit at such time or times as the commission may require statements and reports, including full information as to assets and liabilities, capitalization, net investment and reduction thereof, gross receipts, interest due and paid, depreciation and other reserves, cost of project, cost of maintenance and operation of the project, cost of renewals and replacements of the project works, and as to depreciation of the project works and as to production, transmission, use and sale of power; also to require any licensee to make adequate provision for currently determining said costs and other facts."[14] To make its purpose doubly clear, in this

---

e), 800, 802(b), 803 note, 807 note, 812, 813, 815, 821; Federal Power Act of 1935, 49 Stat. 838, §§ 202(c) (e) (f), 206 (e), 207, 210(b); id., Part II, 49 Stat. 847, §§ 201(a) (b), 202(a) (b), 203(a), 204(f), 206(b), 207, 209(a) (b) (c); id., Part III, 49 Stat. 854, §§ 301(a), 302(a) (b), 306, 307, 308(a), 313(a), 16 U.S.C.A. §§ 797(c–f), 803(e), 807, 817(b), 824 (a, b), 824a (b), 824b (a), 824c (f), 824e (b), 824f, 824h (a–c), 825(a), 825a (a, b), 825e, 825f, 825g(a), 825*l*(a).

[9] Federal Water Power Act of 1920, 41 Stat. 1063, as amended by the Federal Power Act of 1935, 49 Stat. 854, 16 U.S.C.A. § 825, provides, in part: " * * * That nothing in this chapter shall relieve any public utility from keeping any accounts, memoranda, or records which such public utility may be required to keep by or under authority of the laws of any State. The Commission may prescribe a system of accounts to be kept by licensees and public utilities and may classify such licensees and public utilities and prescribe a system of accounts for each class. The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited. The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, * * * ." North-

ern States Power Co. v. Federal Power Commission, 7 Cir., 118 F.2d 141, 144; Northwestern Elec. Co. v. Federal Power Commission, 9 Cir., 125 F.2d 882.

Cf. Interstate Commerce Commission v. Goodrich Transit Co., 224 U.S. 194, 213, 32 S.Ct. 436, 440, 56 L.Ed. 729: " * * the act should be given a practical construction, and one which will enable the Commission to perform the duties required of it by Congress * * * "; American Tel. & Tel. Co. v. United States, 299 U.S. 232, 237, 57 S.Ct. 170, 172, 81 L.Ed. 142: " * * * in gauging rationality, regard must steadily be had to the ends that a uniform system of accounts is intended to promote."; 1 Pike and Fischer, Admin.Law, Current Text, 34c.1-7: " * * * there is little ground for supposing that Congress intended to limit the Federal Power Commission's jurisdiction over accounts to the extent that state regulation exists and is enforced."

[10] Northern States Power Co. v. Federal Power Commission, 7 Cir., 118 F.2d 141, 144.

[11] Northwestern Elec. Co. v. Federal Power Commission, 9 Cir., 125 F.2d 882.

[12] 41 Stat. 1067, § 4(h), 16 U.S.C.A. § 797 note.

[13] 41 Stat. 1065, § 4(a), 16 U.S.C.A. § 797(b).

[14] 41 Stat. 1066, § 4(f), 16 U.S.C.A. § 797 note.

respect, the statute provides specifically that: "All such statements and reports shall be made upon oath, unless otherwise specified, and in such form and on such blanks as the commission may require. Any person who, for the purpose of deceiving, makes or causes to be made any false entry in the books or the accounts of such licensee, and any person who, for the purpose of deceiving, makes or causes to be made any false statement or report in response to a request or order or direction from the commission for the statements and report herein referred to shall, upon conviction, be fined not more than $2,000 or imprisoned not more than five years, or both."[15]

And to make doubly clear the powers of the Commission, generally, the Act provides: "That any licensee, or any person, who shall willfully fail or who shall refuse to comply with any of the provisions of this Act, or with any of the conditions made a part of any license issued hereunder, or with any subpœna of the commission, or with any regulation or lawful order of the commission, * * * shall be deemed guilty of a misdemeanor, and on conviction thereof shall, in the discretion of the court, be punished by a fine of not exceeding $1,000, in addition to other penalties herein prescribed or provided by law; and every month any such licensee or any such person shall remain in default after written notice from the commission, * * * shall be deemed a new and separate offense punishable as aforesaid."[16]

The Company, as a licensee under the 1920 Act, took its license with knowledge of the following provision: "Each such license shall be conditioned upon acceptance by the licensee of *all the terms and conditions of this Act * * *.*"[17] [Italics supplied] Hence, it took with full notice of the provisions heretofore set forth.

Moreover, it took with knowledge of the duties of the Commission, performance of which requires not merely full access to the Company's accounts, but control of their form and content. Included among those duties are the following: (1) To deter-

mine the net investment of the licensee in the project.[18] It is necessary, in order that the Commission may comply with the mandate of the statute, that it (2) shall for this purpose, not merely determine (i) the actual legitimate original cost thereof as defined and interpreted in the "classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission," but, also, that it shall ascertain and add thereto (ii) similar costs of additions thereto and betterments thereof, and that it shall ascertain and deduct therefrom (iii) "the sum of the following items *properly allocated thereto,* if and to the extent that such items have been *accumulated during the period of the license from earnings in excess of a fair return on such investment*: (a) *Unappropriated surplus, (b) aggregate credit balances of current depreciation accounts, and (c) aggregate appropriations of surplus or income held in amortization, sinking fund, or similar reserves, or expended for additions or betterments or used for the purposes for which such reserves were created.*"[19] [Italics supplied] (3) To require the licensee to establish and maintain depreciation reserves sufficient to insure the maintenance of the project works in a condition of adequate repair for efficient operation in the development and transmission of power.[20] (4) To require the licensee to establish and maintain amortization reserves out of surplus which may be earned by it, *after the first twenty years of operation,* and accumulated by it in excess of a reasonable rate of return, to be specified by the Commission, upon the actual, legitimate investment of the licensee in the project.[21] (5) To determine, in its discretion, whether such amortization reserves shall be held until the termination of the license or be applied from time to time in reduction of the net investment.[22] (6) To fix the amount of reasonable annual charges which the licensee shall pay to the United States (a) for the purpose of reimbursing the United States for the costs of administering the Act; (b) for recompensing it for the use, occupancy, and enjoyment of its lands or other property; and (c) for the expropriation to the Government of ex-

[15] 41 Stat. 1066, § 4(f), 16 U.S.C.A. § 797 note.
[16] 41 Stat. 1076, § 25.
[17] 41 Stat. 1067, § 6.
[18] 41 Stat. 1065, § 4(a), 16 U.S.C.A. § 797(b).

[19] 41 Stat. 1064, § 3, 16 U.S.C.A. § 796.
[20] 41 Stat. 1069, § 10(c), 16 U.S.C.A. § 803(c).
[21] 41 Stat. 1069, § 10(d), 16 U.S.C.A. § 803(d).
[22] Ibid.

cessive profits.[23] (7) in fixing the charges specified in (6) the Commission must seek to avoid increasing the price of power to consumers and to this end charges for the expropriation of excessive profits may be adjusted by the Commission, *from time to time, as conditions may require.*[24] (8) To require that any licensee, who may be benefited by the construction work of another licensee, a permittee, or of the United States, of a storage reservoir or other headwater improvement, shall reimburse the owner of such reservoir or other improvements for such part of the *annual charges* for interest, maintenance and depreciation thereon as the Commission may deem equitable. And for this purpose the statute provides, expressly, that the Commission shall determine the proportion of such *annual charges* which shall be paid by the licensee.[25] (9) To fix the just and fair compensation which shall be paid by the United States for the use of any project taken over by the United States, when in the opinion of the President of the United States the safety of the country demands such taking. The Commission is charged to fix such compensation upon the basis of a reasonable profit in time of peace, and the cost of restoring the property to as good condition as existed at the time of taking, less the reasonable value of any improvements that may be made thereto by the United States and which are valuable and serviceable to the licensee.[26] (10) To regulate and control so much of the services rendered by the licensee, and of the rates and charges of payment therefor as constitute interstate or foreign commerce.[27]

The statute not merely requires the Commission to perform these and other similar duties[28] but specifies expressly that all licenses issued under the Act, shall be conditioned upon compliance, by the licensee, with the requirements set out in (3), (4), (5), (6), (7), (8).[29] In addition, the statute specifies that the Commission may impose such further conditions not inconsistent with its provisions as the Commission may require.[30]

The rules and regulations of the Commission were attached to, and made a part of, the license which was issued to the Company. These included a regulation that the licensee should "conform to such rules and regulations *as may be prescribed by the commission from time to time* for the establishment and maintenance of a system of accounts and for the keeping and preserving of such books, records, and memoranda pertaining to the project and the project accounts as may be required by the commission." [31] [Italics supplied] They included, also, the following: "The commission reserves to itself the right to investigate and make any lawful order concerning any item or amount included in the cost of the original project or of any addition thereto or betterment thereof, whether such cost is incurred by the licensee during the period of the license, or by a permittee or other person natural or artificial prior to the issuing of a license under the act." [32]

█ Not only is it clearly apparent, therefore, that the Commission had full power to require accounting disposition of all items here in dispute, but it seems inescapable that accounting disposition of all was at issue from the very beginning of the proceedings here under review. Unless accounting disposition had been contemplated for the purposes of the statute, the inquiry would have been without meaning. The Company received its license with full knowledge that the law required it to cooperate with the Commission to the ends therein stated. It is impossible to read the statute without realizing the necessity of ascertaining and making accounting disposition of all items which the licensee put in issue. "The grant of a license, being a privilege

[23] 41 Stat. 1069, § 10(e), 16 U.S.C.A. § 803(e).

[24] Ibid.

[25] 41 Stat. 1070, § 10(f), 16 U.S.C.A. § 803(f).

[26] 41 Stat. 1072, § 16, 16 U.S.C.A. § 809.

[27] 41 Stat. 1073–1074, § 20, 16 U.S.C.A. § 813.

[28] See 41 Stat. 1070, 1071, 1072, 1073, 1074, 1076, §§ 11, 12, 14, 20, 26, 16 U.S.C.A. §§ 804, 805, 807, 813, 820. Section 26 of the 1920 Act provides for the institution, by the Attorney General, of proceedings in equity for the purpose of revoking any license issued under the Act because of the violation of its terms "or for the purpose of remedying or correcting by injunction, mandamus, or other process any act of commission or omission in violation of the provisions of this Act [title] or of any lawful regulation or order promulgated hereunder."

[29] 41 Stat. 1068, § 10, 16 U.S.C.A. § 803.

[30] 41 Stat. 1070, § 10(g), 16 U.S.C.A. § 803(g).

[31] Regulation 20, Accounts and Reports, as amended June 6, 1921, § 1.

[32] Id. at § 6.

from the sovereign, can be justified only on the theory of resulting benefit to the public. The act, therefore, should receive a practical construction,—one enabling the Commission to perform facilely the duties required of it by Congress."[33] Every step in the proceedings and in the negotiations taken by the Commission has been for the purpose of establishing an accounting basis upon which it could perform its duties with respect to the licensee and to the public.[34] This is precisely that regulation which is contemplated by the Act.[35] Such an accounting basis should have been established, for the present licensee, years ago. This is evidenced by the fact that the Company's license has been in effect for over twenty years and, pursuant to the terms of the statute—as one of its duties, listed on an earlier page—the Commission must now determine, for inclusion in the amortization reserve required by Section 10(d) of the Act,[36] surplus earned thereafter and accumulated in excess of the reasonable rate of return specified in the license. "There must be a limit to individual argument in such matters if government is to go on."[37]

◼ We come now to the actual disposition, ordered by the Commission, to be made of the disallowed items. Judicial power in reviewing this matter is defined by the Supreme Court as follows: "This court is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action here involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles of correct accounting' (Kansas City Southern Ry. Co. v. United States, 231 U.S. 423, 444, 34 S.Ct. 125, 131, 58 L.Ed. 296, 52 L.R.A.,N.S., 1) as to be the expression of a whim rather than an exercise of judgment. Norfolk & Western Ry. Co. v. United States, 287 U.S. 134, 141, 53 S.Ct. 52, 54, 77 L.Ed. 218; Kansas City Southern Ry. Co. v. United States, supra, 231 U.S. 423, at page 456, 34 S.Ct. 125, 58 L.Ed. 296, 52 L.R.A.,N. S., 1. Then, too, in gauging rationality, regard must steadily be had to the ends that a uniform system of accounts is intended to promote. 'The object of requiring such accounts to be kept in a uniform way and to be open to the inspection of the Commission is not to enable it to regulate the affairs of the corporations not within its jurisdiction, but to be informed concerning the business methods of the corporations subject to the

---

[33] Northern States Power Co. v. Federal Power Commission, 7 Cir., 118 F.2d 141, 144, and authorities there cited.

[34] The Company's Initial Cost Statement was filed with the Commission on March 29, 1930. On May 31, 1930, the Commission's accounting staff submitted a Preliminary Accounting Report proposing numerous eliminations from and some additions to the Company's Initial Cost Statement. On September 6, 1930, the Company submitted a protest to the Preliminary Accounting Report and denied the authority or power of the Commission to take any binding action on the Preliminary Accounting Report or to modify, alter, or in any way change the Company's Initial Cost Statement, or to make any order based on such change. After hearings in December, 1931, and pursuant to the direction contained in the Commission's opinion dated June 30, 1932, an order was entered on November 9, 1932, directing the entry of allowed legitimate original cost in the Company's fixed capital accounts with appropriate corrective entries in subsidiary ledgers. In the proceedings in the District Court in 1936, in the case of Alabama Power Co. v. McNinch, reversed on appeal, 68

App.D.C. 132, 94 F.2d 601, the Company introduced testimony as to the cost of making the corrective ledger entries. After hearings subsequent to the remand of the case by this court to the Commission, the latter entered the order of November 26, 1940, supplementing that of December 19, 1932, and directing entry of the allowed legitimate original cost in the fixed capital accounts, with appropriate entries in subsidiary ledgers. The order further directed the Company to charge disallowed cost to earned surplus. The scope of the issues involved is stated by Commissioner Smith, concurring in the opinion of the Commission dated June 30, 1932, where he stated that the Company was questioning the power of the Commission "to require * * * [petitioner] to omit from its capital accounts any item of cost therein."

[35] Northern States Power Co. v. Federal Power Commission, 7 Cir., 118 F. 2d 141, 144.

[36] Federal Water Power Act of 1920, 41 Stat. 1069, 16 U.S.C.A. § 803(d).

[37] Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372.

·act that it may properly regulate such matters as are really within its jurisdiction.' Interstate Commerce Comm'n v. Goodrich Transit Co., 224 U.S. 194, 211, 32 S.Ct. 436, 439, 561 L.Ed. 729; cf. Kansas City Southern Ry. Co. v. United States, supra, 231 U.S. 423, at page 445 34 S.Ct. 125, 58 L.Ed. 296, 52 L.R.A.,N.S., 1." [38] With these instructions in mind we proceed to consider the Company's objections to the proposed accounting.

 Specifically, the Company expresses apprehension that if it were required to comply with the Commission's order, it would, as a result, be deprived of a judicial determination of value, when and if the Government institutes recapture proceedings. The apprehension is ill-founded. What effect is to be given, in future recapture proceedings, to the Commission's determination of actual legitimate original cost is not now before this court.[39] If petitioner should be foreclosed from reopening that question, it will be because the Power Act so provides;[40]

not because the accounting entries presently enjoined upon it are conclusive as to the value of the property.[41] Whatever effect the present determination may be given in recapture proceedings, the Commission is clearly authorized to determine such cost without waiting for the occurrence of such a contingency.[42] The power to direct that the Company's books shall properly reflect its determination merely carries that proceeding to completion.[43] No reason is apparent why the exercise of the power to direct particular accounting entries,[44] any more than the power to determine original cost, should be deferred to some remote time when recapture proceedings may be initiated. Petitioner overlooks the extensive and continuing regulatory power which the Commission is required to exercise.[45]

 The Company contends, further, that if the Commission's order for accounting disposition of the disallowed items is imposed upon it, the result will be to prevent it from capitalizing its actual assets.

---

[38] American Tel. & Tel. Co. v. United States, 299 U.S. 232, 236, 237, 57 S.Ct. 170, 172, 81 L.Ed. 142. Cf. Northwestern Elec. Co. v. Federal Power Commission, 9 Cir., 125 F.2d 882, 885: "There is nothing in the act which authorizes us to determine what is necessary or appropriate for purposes of administration of the act. The duty to make such a determination is imposed by the statute on respondent. After such determination, the only question which may be presented to us is one of law. The question of law has been expressed in various words, such as: * * * All these expressions lead to one conclusion, which is: could any reasonable man take the view announced by the Commission? If he could, then the action of the Commission must be sustained."; 1 Pike and Fischer, Admin. Law, Current Text, § 34c.1.

[39] Cf. Montana Power Co. v. Federal Power Commission, 9 Cir., 112 F.2d 371, 374.

[40] Federal Water Power Act of 1920, § 14, 41 Stat. 1071, as amended by the Federal Power Act of 1935, 49 Stat. 844, 16 U.S.C.A. § 807: " * * * before taking possession it [the United States] shall pay the net investment of the licensee in the project or projects taken, not to exceed the fair value of the property taken, * * *. The net investment of the licensee in the project or projects so taken and the amount of such severance damages, if any, shall be determined by the Commission after notice and opportunity for hearing. * * *

nor shall the values allowed for water rights, rights-of-way, lands, or interest in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee: * * * ."

[41] State Corporation Commission v. Wichita Gas Co., 290 U.S. 561, 569, 54 S. Ct. 321, 78 L.Ed. 500; Norfolk & Western Ry. v. United States, 287 U.S. 134, 142, 53 S.Ct. 52, 54, 76 L.Ed. 218: " * * · * the mere accounting classification can conclude neither the Commission nor the appellant upon the hearing of an application under section 20a(2) [49 U.S. C.A. § 20a(2)]" Kripke, Accountants' Financial Statements and Fact-Finding in the Law of Corporate Regulation, 50 Yale L.J. 1180, 1190, 1203; 1 Pike and Fischer, Admin.Law, Current Text, 34c.1-8.

[42] Clarion River Power Co. v. Smith, 61 App.D.C. 186, 188, 59 F.2d 861, 863, certiorari denied, 287 U.S. 639, 53 S.Ct. 88, 77 L.Ed. 553.

[43] Northern States Power Co. v. Federal Power Commission, 7 Cir., 118 F.2d 141, 144.

[44] Federal Power Act of 1935, Part III, 49 Stat. 854, 16 U.S.C.A. § 825(a): " * * * The Commission, after notice and opportunity for hearing, may determine by order the accounts in which particular outlays and receipts shall be entered, charged, or credited."

[45] Clarion River Power Co. v. Smith, 61 App.D.C. 186, 188, 59 F.2d 861, 863, certiorari denied, 287 U.S. 639, 53 S.Ct. 88, 77 L.Ed. 553.

It urges in support of its contention (1) that the law of Alabama permits capitalization upon a basis of *reasonable value*, as distinguished from actual original cost;[46] (2) that the law of Alabama permits increased capitalization on increased value of accumulated (already held) property;[47] (3) that it, the present consolidated company, was formed in 1927 and at that time paid to the then existing licensees a consideration equivalent to the amount which such licensees carried on their books as the costs of those properties; (4) hence, that, whether or not the Commission correctly determined the actual, legitimate original cost as of 1913, the items rejected by the Commission constituted a "true increment of value" which the Commission is without power to order written off. (5) It contends, generally, in this connection that the Commission exceeded the bounds of its administrative powers and deprived it of due process by refusing to give notice and hearing concerning the propriety of transferring the disallowed items from one account to another.

⬛⬛⬛ As for the first two points, it must be observed that it is the Federal Power Act[48] and not the law of Alabama which declares the standards which the Commission must use in performing its duties. That Act does not direct the Commission to find *reasonable value* or *actual assets,* but, instead, it directs that it first determine the actual, legitimate original cost.[49] The present proceeding was directed to that end.

Thereafter, the Act directs the Commission to determine a number of other items—none of which are called *reasonable value* or *actual assets*—and which, when determined will, presumably, then be reflected in appropriate accounts. As for the third point, the fact that the Company—which received its license in 1931—carried on transactions with the earlier licensees in 1927, gives it no preferred standing over the earlier licensees, and in no way affects the actual legitimate original cost. The important fact is that it received its license by transfer, subject to its acceptance of all the terms and conditions of the Federal Water Power Act and of the further conditions imposed by the Commission.

In support of its fourth point—that the Commission's order requires it to write off items which constitute a true increment of value, thus preventing it from capitalizing its actual assets[50]—the Company relies upon certain language of the Supreme Court in American Tel. & Tel. Co. v. United States, concerning a requirement of the Federal Communications Commission that " 'the amounts recorded in this account with respect to each property acquisition shall be disposed of, written off, or provision shall be made for the amortization thereof in such manner as this Commission may direct.' "[51] The Supreme Court said, if the foregoing language meant that the difference between original cost and present cost was not to be reckoned, either wholly or in part, as a state-

---

46 State ex rel. White v. Citizens Light & Power Co., 172 Ala. 232, 236, 237, 55 So. 193, 194, 195; Clinton Mining & Mineral Co. v. Jamison, 3 Cir., 256 F. 577, 579, 580.

47 See Fitzpatrick v. Dispatch Pub. Co., 83 Ala. 604, 607.

48 Federal Water Power Act of 1920, 41 Stat. 1065, as amended by the Federal Power Act of 1935, 49 Stat. 839, 16 U.S.C.A. § 797(b).

49 Cf. Northwestern Elec. Co. v. Federal Power Commission, 9 Cir., 125 F.2d 882.

50 The Company asserts that compliance with the Commission's order will be greatly prejudicial "by compelling Petitioner to show to the consumer, the public, and regulatory bodies, a false and low value on its properties," that an understatement of surplus will "repel investors and depreciate the real value of the securities held by present investors" and tends "to prevent the declaration of dividends out of funds properly available for the same."

Cf. Kansas City Southern Ry. v. United States, 231 U.S. 423, 453, 455, 456, 34 S.Ct. 125, 135, 58 L.Ed. 296, 52 L.R.A., N.S., 1: "Supposing, however, that the enforcement of the accounting system does require [the preferred stockholders] to forego their current dividends, we do not concede that this amounts to an unlawful taking of their property.

\* \* \* \* \* \*

" . . . of the argument that enforcement of the regulations will impair the credit of appellant by diminishing apparent earnings, preventing continuance of dividends upon preferred stock, and keeping down the aggregate value of 'assets' upon the property accounts. Presumably the regulations have a tendency to place the accounting system upon a sound basis in these respects; and to accomplish this was one of the legitimate objects at which Congress aimed in the enactment of § 20 of the interstate commerce act [49 U.S.C.A. § 20]."

51 299 U.S. 232, 240, 57 S.Ct. 170, 174, 81 L.Ed. 142.

ment of·existing assets, but must be written off completely, on the theory that the Commission was charged with a mandatory duty to extinguish the entire balance because its presence under the title of "investments" was supposed to have the effect of a misleading label, then there would be force in the contention that the effect of the order was to distort in an arbitrary fashion the value of the assets.[52] But the Court accepted, as a binding administrative construction, as to the meaning of the quoted language, the declaration of an Assistant Attorney General as follows: " * * * 'that amounts included in account 100.4 that are deemed, after a fair consideration of all the circumstances, to represent an investment which the accounting company has made in assets of continuing value will be retained in that account until such assets cease to exist or are retired; and, in accordance with paragraph (C) of account 100.4, provision will be made for their amortization.' "[53] And the Court distinguished the New York Edison Co. case,[54] "where under rules prescribed by the Public Service Commission of New York, there was an inflexible requirement that an account similar in some aspects to 100.4 be written off in its entirety out of surplus, whether the value there recorded was genuine or false."[55] The Court said that an item included in the adjustment account is thereby classified "as provisionally a true investment, subject to be taken out of that account and given a different character if investigation by the Commission shows it to be deserving of that treatment."[56] And, it concluded, "The administrative construction now affixed to the contested order devitalizes the objection that the difference between present value and

original cost is withdrawn from recognition as a legitimate investment."[57] The Company argues from this that, in the present case, the purpose of the Commission's order is to achieve exactly the result which was, by implication at least, forbidden by the Supreme Court in the Telephone Company case, i. e., to withdraw from recognition as a legitimate investment and destroy as an asset the difference between present value and original cost, whether the value thereof was true or false.

It is very doubtful whether an analogy can properly be drawn between the present case and the Telephone Company case, or between the powers of the Communications Commission, when it acts to prescribe a system of accounting for the telephone companies, and the Power Commission when it acts with regard to the accounting systems of its licensees. The telephone companies are not licensees. The difference between their status and that of the radio broadcasting companies— which *are* licensees—is clearly drawn in the Communications Act.[58] It is not necessary to determine, for the purposes of this decision, whether the rights of the Power Commission's licensees are as unsubstantial as those of the radio broadcasting companies.[59] That they are by no means so substantial as those of the telephone companies and other carriers seems clear.[60]

The powers of the Federal Power Commission over licensees, like those of the Federal Communications Commission over its licensed radio broadcasters, are "comprehensive and inclusive."[61] Nor

[52] Id.

[53] American Tel. & Tel. Co. v. United States, 299 U.S. 232, 241, 57 S.Ct. 170, 174, 81 L.Ed. 142.

[54] New York Edison Co. v. Maltbie, 244 App.Div. 685, 281 N.Y.S. 223; Id., 271 N.Y. 103, 2 N.E.2d 277.

[55] American Tel. & Tel. Co. v. United States, 299 U.S. 232, 241, 57 S.Ct. 170, 174, 81 L.Ed. 142.

[56] American Tel. & Tel. Co. v. United States, 299 U.S. 232, 242, 57 S.Ct. 170, 175, 81 L.Ed. 142.

[57] American Tel. & Tel. Co. v. United States, 299 U.S. 232, 241, 242, 57 S.Ct. 170, 175, 81 L.Ed. 142.

[58] 48 Stat. 1066, § 3(h), 47 U.S.C.A. § 153(h). Sections 201 to 221(d), 48 Stat. 1070–1081, 47 U.S.C.A. §§ 201–221(d), are devoted to the regulation of common

carriers in matters of rates, services, practices, etc. Sections 301 to 329, 48 Stat. 1081–1092, as amended by the Act of May 20, 1937, 50 Stat. 191–197, §§ 6 to 10(b), 47 U.S.C.A. §§ 301–362 (b), are special provisions relating to radio. See Yankee Network, Inc. v. Federal Communications Commission, 71 App.D.C. 11, 20, 107 F.2d 212, 221, note 47.

[59] Federal Communications Commission v. Sanders Brothers Radio Station, 309 U.S. 470, 475, 476, 60 S.Ct. 693, 84 L.Ed. 869, 1037; Yankee Network, Inc., v. Federal Communications Commission, 71 App.D.C. 11, 20, 21, 107 F.2d 212, 221, 222.

[60] See notes 17, 21–32, inclusive, supra.

[61] Yankee Network, Inc., v. Federal Communications Commission, 71 App.D. C. 11, 20, 107 F.2d 212, 221.

is the reason far to seek. In granting the privilege of exploiting the water resources of navigable streams, or the channels of radio communication, the Federal Government is making grants out of its exclusive domain.[62] Aside from statute, there is no right to engage in such activity.[63] The grant of such privileges may be made subject to conditions appropriate to safeguard the interest of the public.[64] Having received its license subject to such conditions, and enjoying such privileges as it does, subject to the severe limitations imposed by the statute,[65] the Company cannot shuck off its obligations as a licensee and set itself up in another capacity, or avoid the comprehensive and inclusive powers of the Commission.

The attempted analogy is, apparently, based upon a misconception of the different formulae prescribed by the Water Power Act for valuation of the properties of (1) licensees of the Federal Power Commission and (2) other public utilities subject to its control; as well as a misconception of the different formulae prescribed by the Communications Act. In making valuations of the property of common carriers—as distinguished from its radio broadcasting licensees—the Communications Commission is governed by entirely different provisions of the statute [66] and is required to give consideration to other elements of value than those of original cost.[67] And the Power Commission, in making valuations for purposes of rate regulation of public utilities—not its licensees—is governed, also, by a different formula than when it makes valuations of

the property of a licensee. The formula for valuation of properties of licensees, for rate making purposes, is contained in the provisions of sections of the 1920 Act,[68] which were incorporated into Part I of the Federal Power Act of 1935.[69] Part II of the Power Act [70] is that which deals with public utilities subject to the control of the Federal Power Commission, by reason of being engaged in distribution of electric power in interstate commerce. The formula of valuation there prescribed, for purposes of rate regulation, provides that the Commission may ascertain the actual legitimate original cost of such utilities and *"when found necessary* for rate-making purposes, other facts which bear on the determination of such cost or depreciation, and the fair value of such property." [71] [Italics supplied] It will be seen that this formula gives due consideration to the constitutional doctrine of "fair value," *when found necessary.*[72] In the present case, therefore, the Commission observed the formula prescribed by the statute and valued the properties of its licensee at "actual legitimate original cost." It was not required to consider other elements of value in doing so, as it might have been if it had been engaged in a valuation of the properties of public utilities which are subject to its control under Part II of the Act; and as the Communications Commission was required to do in prescribing the system of accounts which was challenged in the Telephone case.

Moreover, the attack which was made upon the order of the Communications Commission in the Telephone case challenged, not the power of that Commission

[62] Blachly and Oatman, Federal Regulatory Action and Control (1940) 16.

[63] Yankee Network, Inc., v. Federal Communications Commission, 71 App.D.C. 11, 15, 107 F.2d 212, 216.

[64] Newport & Cincinnati Bridge Company v. United States, 105 U.S. 470, 479, 482, 26 L.Ed. 1143; United States v. Appalachian Elec. Power Co., 311 U.S. 377, 427, 428, 61 S.Ct. 291, 85 L.Ed. 243; Pennsylvania Water & Power Co. v. Federal Power Commission, 74 App.D.C. 351, 123 F.2d 155, 163, certiorari denied 62 S.Ct. 640, 86 L.Ed. ——.

[65] See notes 17 to 32, inclusive, supra.

[66] See note 58 supra.

[67] E. g., the carriers must submit estimates of reproduction cost. Communications Act of 1934, 48 Stat. 1074, 47 U.S.C.A. § 213(b); American Tel. & Tel.

Co. v. United States, 299 U.S. 232, 240, 57 S.Ct. 170, 81 L.Ed. 142.

[68] See 41 Stat. 1074, 1071, 1064, 16 U.S.C.A. §§ 813, 807, 796; Alabama Power Co. v. McNinch, 68 App.D.C. 132, 137, 94 F.2d 601, 606.

[69] 49 Stat. 847, § 212, 16 U.S.C.A. § 797 note.

[70] 49 Stat. 847–854, 16 U.S.C.A. §§ 824–824h.

[71] 49 Stat. 853, § 208(a), 16 U.S.C.A. § 824g(a).

[72] See Federal Power Commission v. Natural Gas Pipeline Co., 62 S.Ct. 736, 86 L.Ed. ——, and the concurring opinion of Justices Black, Douglas and Murphy, at page 749 of 62 S.Ct., 86 L.Ed. ——. See the concurring opinion of Justice Frankfurter, in Driscoll v. Edison Light & Power Co., 307 U.S. 104, 122, 59 S.Ct. 715, 83 L.Ed. 1134.

to prescribe a general system of accounting, but the effect of the general system there prescribed, in distorting, as was claimed, the capital assets of the affected companies, and by leaving uncertain and undetermined the character of certain disputed items in an *adjustment* account. In the present case the only attack which is made upon the general system of accounting prescribed by the Commission is that the Power Commission is without power to prescribe *any* general system of accounting for the appellant Company except one which conforms to the Company's ideas of an appropriate system of accounting under the 1920 Act. This contention, as we have already shown, is entirely without merit.[73] The specific attack of the present case— entirely unlike that of the Telephone case— is upon the Commission's order requiring that certain disputed and adjudicated items shall be transferred from one account to another account of the uniform system of accounts prescribed by the Power Commission for all its licensees.

And, finally, as indicating the lack of a valid analogy, is the fact that the telephone companies are forbidden to keep other accounts than those prescribed by the Communications Commission;[74] while power company licensees must comply, in addition, with the accounting requirements of states to which they may be subject;[75] and there appears to be no limitation upon their power to keep such other subsidiary and explanatory accounts as they may wish.[76]

■ Even if we were to assume, for the purpose of argument, however, the validity of the suggested analogy, still the situation existing in the present case is so far different as to make completely inapplicable the language of the Supreme Court's decision in the Telephone case, up-

on which the present appellant relies. The contested order of the Federal Power Commission requires that the total of all disallowed items "be transferred from the *project account* and charged to the earned surplus account * * ·*." [Italics supplied] Full, elaborate and long-continued hearings were held by the Commission concerning these items. As to each of them the Commission has held that they do not constitute *actual legitimate* cost. As to each of them we have upheld the Commission's determination. Consequently, the supposed value of the items has been determined to be false rather than genuine; the investigation and determination made by the Commission, and upheld by this court, shows that the treatment ordered by the Commission is proper; there is no distortion of the value of assets. In this connection the following language of the Supreme Court in the Telephone case should be noted: "We are not impressed by the argument that the classification is to be viewed as arbitrary because the fate of any item, its ultimate disposition, remains in some degree uncertain until the Commission has given particular directions with reference thereto." [77] · In the present case the Commission has given particular directions with reference to the disputed items; there is no uncertainty; no reason for further inquiry; no further question to be determined concerning them.[78]

■ Obviously, the Commission was acting within the scope of its authority and properly performing its administrative duty when it required the Company to remove the disallowed items from the project account. Where, then, shall they be put? The Commission says, in the earned surplus account. The Company has been unable to suggest any other. In its order

---

[73] See notes 17, 29–32, inclusive, supra.

[74] Communications Act of 1934, 48 Stat. 1079, 47 U.S.C.A. § 220(g).

[75] Federal Power Act of 1935, 49 Stat. 854; 16 U.S.C.A. § 825(a); Northwestern Elec. Co. v. Federal Power Commission, 9 Cir., 125 F.2d 882.

[76] Differences in comparable statutes cannot be assumed to be without design. Cudahy Packing Co. v. Holland, 62 S.Ct. 651, 86 L.Ed. ——.

[77] American Tel. &. Tel. Co. v. United States, 299 U.S. 232, 242, 57 S.Ct. 170, 175, 81 L.Ed. 142.

[78] Cf. American Tel. & Tel. Co. v. United States, 299 U.S. 232, 244, 57 S.Ct. 170, 175, 81 L.Ed. 142: "But one of the

very reasons for establishing that account is that in advance of inquiry by the Commission as to the property there included it is impracticable to determine what portion of it may properly be subjected to charges of this nature. When that inquiry has been completed, the Commission will be in possession of the necessary data. Provision will then be made for amortization of any amounts in the account that may properly be classified as investment in depreciable property. The label is unimportant, whether depreciation or amortization, if the substance of allowance is adequately preserved."

of November 9, 1932, the Commission directed its licensee, the Company, to establish and maintain control and subsidiary ledger sheets or accounts showing a total debit balance in its fixed capital accounts beginning with an entry of $7,098,512.51 as the actual legitimate original cost of the project. In December, 1932, it modified its earlier order, reducing slightly the amount fixed for actual legitimate original cost; expressly disallowed the amount of the other claimed items and extended the time for compliance with its earlier order, to establish and maintain accounts. Then followed a long period of extensions of time for compliance, the first appeal to this court, the further hearing held by the Commission in compliance with the decision of this court,[79] and, finally, the order of November 26, 1940, complained of on this appeal. The Company had several years in which to set up accounts which would conform, at least in part and in principle, with the Commission's determination. Instead, it contends that it was ignorant of any duty to make accounting disposition of the disallowed items and that accounting disposition was not in issue. On December 21, 1940, it requested further delay and a further hearing "to adduce evidence with respect to the proper accounting practice * * *." With commendable patience, in view of the twenty years which had elapsed since the license was first granted, the Commission then, by its order of January 21, 1941, gave opportunity to its licensee to "show cause in writing, under oath, why the accounting instructions and requirements * * * [of its orders of the preceding November and December] should not be made effective and enforced, and * * * submit to the Commission *such accounting treatment as the licensee may propose* for the disposition of disallowed items of claimed cost; * * *" [Italics supplied] Instead of accepting the invitation thus extended by the Commission—in response to its own request for such an opportunity—the licensee replied that (1) accounting disposition of the disallowed items was *"not an issue in this proceeding;"* [Italics supplied] (2) the Commission is without authority to provide for accounting disposition of the disallowed items; and (3) finally, "licensee respectfully submits that it cannot propose at this time authoritative accounting treatment for disposition of the items of cost purportedly disallowed by the Commission." Thereafter, on April 26, 1941, the Commission found that the Company had not shown cause why the accounting requirements of its November 26, 1940 order, concerning the disallowed items, should not be made effective; it found that the Company had not proffered any testimony or evidence, or submitted any accounting treatment, for the disposition of disallowed items of claimed cost; wherefore it directed compliance with its earlier order of November 26, 1940. The Company's petition for rehearing of the April 26, 1941 order was also denied by the Commission.

■■ It is apparent, therefore, that the Company has been afforded every reasonable opportunity to present an issue upon the question, to be heard thereon, and to discharge the burden of proof which the statute imposes upon it of justifying any accounting entry which it chooses to make.[80] Instead, it chose to challenge the indisputable powers of the Commission; it not only failed to take advantage of the various opportunities, and to shoulder its burden, but stated its inability and unwillingness to do so. Consequently, it has foregone the opportunity to question the propriety of the order.[81] Certainly, there was, thereafter, no reason for granting a further hearing or for further delaying a disposition of this matter which should have been made years before. Nor is there any warrant for the procedure suggested by the Company of splitting this administrative

---

[79] Alabama Power Co. v. McNinch, 68 App.D.C. 132, 94 F.2d 601.

[80] Federal Power Act of 1935, 49 Stat. 854, 16 U.S.C.A. § 825(a): "The burden of proof to justify every accounting entry questioned by the Commission shall be on the person making, authorizing, or requiring such entry, and the Commission may suspend a charge or credit pending submission of satisfactory proof in support thereof."

[81] National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 47, 57 S.Ct. 615, 81 L.Ed. 893, 108 A. L.R. 1352; Smith v. Hitchcock, 226 U.S. 53, 61, 33 S.Ct. 6, 57 L.Ed. 119; Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 324, 53 S.Ct. 350, 361, 77 L.Ed. 796: "This attitude of obstruction is not to be ignored in determining whether the information to be imparted to the petitioner was curtailed by the Commission in any arbitrary way. One who seeks equity must do it."

proceeding into a series of successive hearings and decisions.[82]

▮ Under these circumstances, it is clearly sufficient, as against the Company's protest, that the disallowed items shall find lodgment in the account specified by the Commission. "A system of accounts may be awkward or imperfect, and yet not so 'arbitrary and outrageous' * * * as to justify a court in restraining its enforcement."[83] After all, the Commission has many duties to perform, over a long period of time,[84] other than coaxing a reluctant licensee to act as the law requires that it shall act.

It will be time enough to consider other phases of appellant's financial problems[85] when it has recognized its existence as a licensee and complied with the preliminary orders of that Commission, which is charged with its regulation. When it has distributed the disputed items in such manner as to reflect accurately the actual original legitimate cost of construction of its project, there will be some basis upon which to proceed in making other determinations and other appropriate entries, as contemplated by the statute.

▮ There is no showing that the Commission overstepped the bounds of its administrative powers or that its orders are entirely or in any wise "at odds with fundamental principles of correct accounting * * *."[86] On the contrary, there has been no suggestion of any possible alternative to that proposed by the Commission, although the opportunity to do so has been long open. There has been no denial of due process; no lack of notice; no deprivation of fair hearing; and no action by the Commission which was not entirely within its jurisdiction and the scope of its duty as imposed by the statute.

Affirmed.

[82] Cf. Opp Cotton Mills, Inc., v. Administrator of Wage and Hour Division, 312 U.S. 126, 152, 153, 657, 61 S.Ct. 524, 536, 85 L.Ed. 624: "The demands of due process do not require a hearing, at the initial stage or at any particular point or *at more than one point* in an administrative proceeding so long as the requisite hearing is held before the final order becomes effective." [Italics supplied]

Cf. National Labor Relations Board v. Mackay Radio & Tel. Co., 304 U.S. 333, 350, 351, 58 S.Ct. 904, 913, 82 L.Ed. 1381: "* * * the issues and contentions of the parties were clearly defined and as no other detriment or disadvantage is claimed to have ensued from the Board's procedure the matter is not one calling for a reversal of the order. The Fifth Amendment guarantees no particular form of procedure; it protects substantial rights. * * * The contention that the respondent was denied a full and adequate hearing must be rejected."

[83] American Tel. & Tel. Co. v. United States, 299 U.S. 232, 243, 57 S.Ct. 170, 175, 81 L.Ed. 142.

[84] Clarion River Power Co. v. Smith, 61 App.D.C. 186, 188, 59 F.2d 861, 863, certiorari denied 287 U.S. 639, 53 S.Ct. 88, 77 L.Ed. 553.

[85] Cf. Kansas City Southern Ry. v. United States, 231 U.S. 423, 455, 456, 34 S.Ct. 125, 58 L.Ed. 296, 52 L.R.A.,N.S., 1, supra note 50.

[86] Kansas City Southern Ry. v. United States, 231 U.S. 423, 444, 34 S.Ct. 125, 131, 58 L.Ed. 296, 52 L.R.A.,N.S., 1; American Tel. & Tel. Co. v. United States, 299 U.S. 232, 236, 237, 57 S.Ct. 170, 172, 81 L.Ed. 142.