**APPALACHIAN POWER COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent (two cases).

Nos. 8952, 9038.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 1, 1963.

Decided Feb. 18, 1964.

238

Chester C. Davis, New York City (Richard M. Dicke, Richard Hawkins, Anthony L. Fletcher, Simpson, Thacher & Bartlett, New York City, George D. Gibson, T. Justin Moore, Jr., Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on brief), for petitioner.

Drexel D. Journey, Atty., Federal Power Commission (Richard A. Solomon, Gen. Counsel, John C. Mason, Deputy Gen. Counsel, Thomas M. Debevoise, Asst. Gen. Counsel, Peter H. Schiff and Daniel Goldstein, Attys., Federal Power Commission, on brief), for respondent.

Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

Appalachian Power Company seeks to set aside a Federal Power Commission order [1] requiring it to install and main-

1. Consolidated in this appeal are two cases —one the appeal from the original Federal Power Commission order and the other the appeal from the Commission order as subsequently amended. The consolidated cases involve identical issues and will be decided together.

tain as an integral part of its basic corporate books certain accounts relating to the effect of deferred tax accounting and to use these accounts in its published financial statements, including those issued to stockholders.

The Company is an electric utility incorporated in Virginia, and doing business not only there but also in West Virginia and Tennessee. Since it derives a portion of its revenues from the interstate sale of electric power it is admittedly subject to regulation by the Federal Power Commission. As a subsidiary of American Electric Power Company, Inc., a registered holding company, Appalachian is likewise subject to the jurisdiction of the Securities and Exchange Commission under the Public Utility Holding Company Act, 15 U.S. C.A. § 79 et seq.

## I. FACTUAL BACKGROUND

Since the Company raises a number of questions relating to the hearing procedures under review, it is necessary to set forth the chronology of events with some particularity. By Order 204, 19 F.P.C. 837 (1958), issued May 29, 1958, the Commission established certain procedures to be used in connection with deferred tax accounting. On October 22, 1959, the Commission issued Order 216, 22 F.P.C. 734 (1959), entitled "Order Clarifying Interpretation of, and Amending Account 266 [as established by Order 204]." While the Company concedes that the Commission in promulgating Order 204 followed the legally prescribed procedure, it contends that Order 216 is procedurally deficient.

The present proceedings were instituted on October 29, 1959, by the Commission (Docket E-6900) by an order directing the Company to show cause why its accounting practices should not be found in violation of the Commission's Uniform System of Accounts. The Company was given 60 days to answer. Rather than answer, as directed, in E-6900, the Company petitioned the Commission, in a separate case docketed as E-6918, either to declare 216 invalidly promul-

gated or to rescind it. The Commission dismissed the petition on May 23, 1960, holding that Order 216 merely interpreted Order 204. 23 F.P.C. 712 (1960).

The Commission on July 8, 1960, denied the Company's motion for an extension of time in E-6900 and set September 12, 1960, as the date for the commencement of the hearing in that case. The Company then answered in E-6900 on July 25, 1960.

On September 2, 1960, the Company petitioned us to review the Commission's May 23 order dismissing E-6918, and the Commission on October 5, 1960, moved to dismiss the petition for review as premature.

In the meantime, at the request of Staff Counsel for the Commission, the hearing in E-6900, originally scheduled for September 12, 1960, was continued to September 19, 1960. On that date the hearing was commenced before Examiner Marsh but no testimony was taken. The Company stated that it was not prepared to proceed and requested a further continuance until the completion of the then pending appeal before the Fourth Circuit. With the consent of Staff Counsel, the hearing was continued to October 17, 1960. While the Company argues that Staff Counsel agreed that there would be further continuances until after the completion of the appeal from the May 23 order, Examiner Marsh made it clear that he was "not ruling on whether or not any further continuances might be had."

The hearing reconvened on October 17, 1960, before Examiner Binder, who was substituted for Examiner Marsh. Company counsel, however, sought a further continuance on the ground that they and Company officials were engaged before the Securities and Exchange Commission in a proceeding involving the Kentucky Power Company, a sister subsidiary of Appalachian Power Company in the American Electric Power Company system. Examiner Binder ordered the hearing delayed until October 24, 1960, when it should proceed, except on such days as one of three designated officers of the

Company might be actually testifying before the SEC in the Kentucky Power case. After this action of the examiner, the Company filed a motion to continue E–6900 until the completion of the Kentucky Power case, but this motion was denied on October 21, 1960.

As the SEC hearing scheduled for October 26 was postponed, Examiner Binder ordered the hearing in E–6900 to proceed. Staff Counsel offered testimony; however, the Company elected not to attend or participate in the hearing, and Examiner Binder ordered the hearing closed.

This court, on November 7, 1960, heard the appeal in E–6918 from the May 23 Commission order and dismissed the case on November 10, 1960. Appalachian Power Co. v. FPC, No. 8207, 4th Cir., Nov. 10, 1960. In our order we noted that:

"[I]t appears from the assurance of [FPC's] counsel, given to the Court during the oral argument of said motion, that the Federal Power Commission will not in any hearing, whether original, on review or on appeal * * * allege or treat the said Order of May 23, 1960 in Commission Docket No. E–6918, as finally adjudicating the validity of said Order No. 216, or as in anywise precluding the petitioner from asserting in said No. E–6900 the invalidity of said Order No. 216 * * *."

We concluded with the proviso that the "dismissal shall be without prejudice to the right of said petitioner [Appalachian] to attack or otherwise question the validity of said Order No. 216 in the said proceeding designated as No. E–6900."

Thereafter the Company filed a motion to reopen E–6900 and the examiner directed Appalachian to submit in writing all testimony which it proposed to introduce and its legal argument thereon. Subsequently, the examiner, after hearing oral arguments on the motion, concluded that it was unnecessary to reopen E–6900 as the Company proffered no evidence contradicting the testimony before

him on October 26, 1960, and that the testimony proffered was more in the nature of legal argument as to the meaning of Order 204 than evidence. The Commission, considering the evidence in the October 26, 1960, hearing plus the evidence and legal argument tendered in the petition to reopen, later agreed with the examiner that it was unnecessary to reopen E–6900.

## II. PROCEDURAL ISSUES

■ A. Substitution of Examiners. The Company complains that it was denied a fair hearing. It contends first that it was improper for the Commission to substitute trial examiners. Where the original trial examiner hears testimony and the demeanor of witnesses is an important factor, the substitution of a new trial examiner might be improper. But here the original examiner heard no testimony, and the substituted examiner, who heard all the evidence, also read the transcript of the proceedings of the original hearing. The Company asserts that it had agreed with the Commission's Staff Counsel that there would be further continuances until after the completion of the appeal from the May 23, 1960, Commission order, and that the substituted examiner disregarded this agreement. The transcript of the first hearing is ambiguous as to the claimed agreement with Staff Counsel for further continuances; however, it records the original examiner's emphatic declaration that he was not then determining the advisability of such further continuances. In these circumstances the substitution of a new examiner was neither improper nor prejudicial. 2 Davis, Administrative Law Treatise (1958) §§ 11.18–11.19.

■ B. Closing Hearing Record. Next, the Company contends that it was unfairly deprived of its rights by the closing of the hearing on October 26, 1960. We find this contention without merit. Almost a full year had elapsed between the issuance of the show cause order and the October 26, 1960, hearing. On three occasions the Company was ac-

corded the opportunity to present its case, and numerous continuances were granted. Despite Appalachian's knowledge that the FPC hearing was scheduled for September 12, 1960, the Company's lawyers made no effort to get the case heard before the FPC and, on the contrary, on July 19, 1960, initiated a proceeding before the SEC on behalf of Appalachian's affiliate, Kentucky Power Company. If a conflict of dates was thus precipitated, it resulted from Appalachian's own procedures. Even so, the examiner granted continuances until there was no actual conflict in hearing dates between the FPC and the SEC, but when the SEC hearing was suspended and the FPC hearing was ordered to proceed, the Company chose to absent itself. We think the Company had more than a reasonable opportunity to present evidence. But as we will next show, the closing of the hearing on October 26, 1960, did not deprive Appalachian of any substantial right. The Company was not prevented or limited in its opportunity to present its contentions, and the Commission did consider them.

C. MOTION TO REOPEN E–6900. The Company argues that the Commission should have reopened E–6900 after this court dismissed the appeal from the May 23 Commission order. As noted above, in dismissing the appeal we stated that our action was not to prejudice the Company's right to attack Order 216 in E–6900. The Company, however, was in no way blocked from asserting its contentions, for following our action both the examiner and the Commission considered a written statement of the testimony the Company proposed to offer, and its brief of the law. In addition there was oral argument before the examiner, which was transcribed and submitted to the Commission. The latter considered the matter and agreed with the examiner

that the proffered testimony was not material, for the reasons above stated.

Also, and more importantly, the Commission order presently under review, which holds the utility in violation, rests solely on Order 204 and not on Order 216. Since this is so, the effort to reopen E–6900 to attack Order 216 is misdirected. The alleged invalidity of Order 216 was the sole basis for the reservation in our order of November 10, 1960. We hold, therefore, that it was unnecessary to reopen the hearing in E–6900. Accordingly, our concern is only with Order 204.

Before dealing with the substantive issues raised by this appeal, a discussion of the relevant accounting theory is presented.

## III. RELEVANT ACCOUNTING THEORY

The traditional treatment of depreciation is by the straight line method. Under this method the cost or other basis of the property (less estimated salvage value) is deducted in equal annual installments over the estimated life of the property. Thus, if the acquisition price or other basis of a piece of property were $100 and its useful life ten years, then, assuming the property had no salvage value, it would be depreciated at the rate of ten dollars per year for ten years.

In an attempt to encourage capital investment, Congress has enacted provisions in the Revenue Code permitting a taxpayer to write off the bulk of his investment during the early years of its useful life. Relevant here are section 167 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 167, permitting liberalized depreciation, and section 168 permitting accelerated amortization. For example, section 167 provides two specific methods of liberalized depreciation—the declining balance method and the sum of the years-digits method.[2]

2. Section 167(a) establishes the general rule: "There shall be allowed as a depreciation deduction *a reasonable allowance* for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business, or (2) of property held for the production of income." [Emphasis added]. In defining "a reasonable allowance" the section specifically provides for the straight line method, the declining balance method and the sum of the

Under the declining balance method up to twice the rate used in the straight line method is applied to the cost of the property in the first year of its use. In each succeeding year this same rate is applied to successively diminishing balances—hence the name "declining balance." The sum of the years-digits method similarly produces early write-offs in slightly varying amounts. The use of either method is within the discretion of the taxpayer, and his decision will depend upon a myriad of business factors, a discussion of which is not necessary here. Regardless of which method is used, however, the total amount depreciated at the end of the depreciation period is the same.[3]

The use of liberalized depreciation affords the taxpayer considerable tax savings in the early years of the life of the property. But in the later years, when the depreciation permitted is less than it would have been had the taxpayer utilized the straight line method of depreciation, the tax liability is increased.

■ In the utility industry, the rate which the public pays for a service is controlled by regulatory agencies. In determining whether a given rate will yield a proper return, it is necessary for the agency to deduct applicable expenses from operating revenues. Tax expense is one of the applicable expenses, Georgia R. & Power Co. v. Railroad Commission, 262 U.S. 625, 632, 43 S.Ct. 680, 67 L.Ed. 1144 (1923); Galveston Electric Co. v. Galveston, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678 (1922); South Carolina Generating Co. v. Federal Power Comm., 249 F.2d 755 (4th Cir. 1957). The use of liberalized depreciation and rapid amortization has a significant effect on a utility's rates, for in the early years of liberalized depreciation when the utility is writing off a large percentage of its investment and its tax expense is accordingly relatively low, its net income is relatively high. The opposite is true in the later years of depreciation. Both the high income of early years and the low income of later years may invite rate proceedings—in the first instance to lower rates and in the second to raise them.

■ So as to eliminate the impact of tax fluctuations upon net operating income arising from a utility's use for income tax purposes of any of the several techniques for the rapid expensing of depreciable assets, a number of regulatory agencies have permitted utilities to normalize their net operating income for regulatory book accounting purposes. This normalization process is commonly referred to as deferred tax accounting. Where a utility does not use, or is prohibited by the regulatory agencies from resorting to normalization, it is said that the utility is using "flow-through" accounting—so called because the immediate effect of tax expenses resulting from a utility's use of liberalized depreciation for income tax purposes is "flowed through" directly to income.

In Cities of Lexington, etc., Ky. v. Federal Power Comm., 295 F.2d 109 (4th Cir. 1961), this court approved the Federal Power Commission's sanction of the use of deferred tax accounting. We there noted the conflicting views as to the propriety of such accounting. The Kentucky cities had argued that only taxes actually paid should be deducted from operating revenues. They also contended that the use of liberalized depreciation did not create increased tax liability for future years because the expanding nature of the utility industry would prob-

years-digits method. In addition to these "any other consistent method productive of an annual allowance [is permissible] which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the [declining balance] method * * *."

3. Section 168, "Amortization of Emergency Facilities," similarly provides for early write-offs. Essentially, depreciation, § 167, and amortization of emergency facilities, § 168, are the same; however, under § 168 a specific formula is provided for "emergency facilities" as defined by the section.

ably require continuous capital expenditures with the result that utilities would be left with a permanent reserve for taxes which would never be needed to meet tax liabilities.

The utilities, on the other hand, argued that the normalization method resulted in a tax deferral and not a tax saving.[4] They also maintained that any assumption that the utility industry would indefinitely continue making capital investments at a rate faster than it retired old investments was speculative.

This court, noting that various state agencies and federal regulatory commissions had come to opposite conclusions as to the relative merits of the *flow-through* and *normalization* methods, acknowledged that it was "confronted * * * with a problem in a special field which requires the exercise of expert skill" and concluded that since the Federal Power Commission had not abused its discretion in authorizing deferred tax accounting, its decision should be followed.

### IV. MEANING OF ORDER 204

The preliminary substantive question here presented is whether Order 204, correctly interpreted, requires the Company to use the Commission's deferred tax accounts in its reports to the Commission. The Company argues that it does not.

A. DEFERRED ACCOUNTING FOR STATE PURPOSES AND MANDATORY USE OF FPC ACCOUNTS. In the discussion accompanying Order 204, the Commission reviewed the possible alternative methods of treating tax deferrals in FPC accounts. It rejected both reserve and restricted surplus treatment because the former, while a direct method of provid-

ing for future tax liability, overly emphasizes a liability concept, and the latter, by treating the fund as surplus, even though restricted, tends to disregard its "essential character as provision from income committed to the single purpose of providing for future taxes." 19 F.P.C. 837, 840 (1958). To meet the objections inherent in each label, the Commission determined to create a new balance sheet account which should not be a part of earned surplus or of reserves. It ordered that the new account be entitled "Accumulated Deferred Taxes on Income." The declared purpose was to "assure clear disclosure of this important item and lessen the possibilities of misunderstanding and misinterpretation of the nature and purposes of accumulated tax deferrals."

The Company presses its view that the accounts, as described in Order 204, themselves indicate that their use is not mandatory. Specifically it points to the language of Paragraphs D of Accounts 281 and 282.[5] Account 282–D is as follows:[6]

"D. The use of this account and the accounting described above are *not mandatory* for any utility, which in accordance with a consistent policy, *elects not* to follow deferred tax accounting even though liberalized depreciation is used in computing taxes on income." [Our italics]

The Company's argument runs as follows: Even though it uses deferred tax accounting in its reports to state commissions, it *elected,* as a deliberate corporate decision, not to follow deferred tax accounting in its reports to the FPC but to use instead the flow-through method. To complete the statement of the Company's position, it should be add-

---

4. It is interesting to note that in the instant case the utility is advancing the opposite theory. Here it argues that the term "deferred tax accounting" is a "misnomer" because once the current tax liability is discharged, no "liability for income tax remains."

5. Order 204 originally designated the account "Accumulated Deferred Taxes on

Income—Accelerated Amortization" as 266.1. This has been renumbered as 281. "Accumulated Deferred Taxes on Income—Liberalized Depreciation," originally numbered 266.2 is now 282.

6. Account 281–D is identical except that it relates to accelerated amortization instead of liberalized depreciation.

ed that it also looks to the introductory language of Accounts 281 and 282:

"The subaccounts below are provided for the use of Public Utilities and Licensees which (a) have *filed* with the Commission, copy of *an order* or other authorization by a state public service commission having jurisdiction, authorizing accounting for deferred taxes on income, [or] (b) in the absence of necessity of authorization by a state public service commission having jurisdiction, have *filed* with the Commission *a statement* of proposed plan of accounting for deferred taxes on income * * *." [Our italics]

From this the Company concludes that, since it has not filed the above-described order or statement, it need not use the FPC accounts.

We think that the Company misinterprets these sections and ignores the Commission's intent as expressed in Order 204. It is undisputed that the Company does use deferred tax accounting for state purposes. The Order makes it plain that its "principal purposes" are "to provide the accounts * * * whereby public utilities and licensees * * * utilizing deferred tax accounting can account for and report tax deferrals" related to liberalized depreciation under section 167 and accelerated amortization under section 168 of the Internal Revenue Code. Where in Paragraphs D the Order declares that the use of the accounts is "not mandatory," it does not mean that a company may always decline to use the FPC deferred accounts. The use of the accounts is *"not* mandatory" only when a utility "in accordance with a consistent policy, elects *not* to follow deferred tax accounting." [Our italics] However, by eliminating the double negative from the above-quoted Paragraphs D, it becomes manifest that if a utility *does* use deferred tax accounting, the use of the accounts prescribed in the Order *is* mandatory.

The option or election left to a utility which uses rapid depreciation or ac-celerated amortization is whether or not to normalize its income, i. e., to use deferred accounting, or to forego such normalization. In the instant case the company has made its election. For state purposes it has elected to normalize its income. Necessarily the use of the FPC accounts became mandatory. The Company does not have an additional option to report to the FPC as though it did not normalize.

If the Commission intended to permit utilities using deferred tax accounting for state purposes to avoid using it for Commission purposes, it would be senseless for the Order to specify that companies not using deferred tax accounting at all need not use it for Commission purposes.

In the discussion which is made a part of Order 204 the Commission makes a significant comment. In setting forth the reasons for not mandatorily requiring its deferred tax accounts in all cases, it says:

"This non-mandatory feature is desirable, among other reasons, to avoid to the extent possible conflict with requirements which may be prescribed by state regulatory authorities having major rate regulatory responsibilities, some of which may authorize and others deny deferred tax accounting."

This reason clearly illuminates the Commission's objective in including the filing provision. As noted above, the use of deferred tax accounting is beneficial to a utility insofar as it insulates its rates from changes resulting from the use of liberalized depreciation and accelerated amortization. One possible conflict to which the Commission alluded, and against which it sought to guard, was suggested to us in argument. If the Commission were to require a utility to use deferred tax accounting in all cases, there might be danger that the utility would use the Commission's order as a basis for arguing to a state that it must conform by permitting normalization. To avoid such conflicts, Order 204 included the filing provision as an assur-

ance that the utility was rightfully using deferred tax accounting.[7]

■ B. TREATMENT OF ACCUMU-LATED DEFERRALS. To effectuate the purpose of Order 204 of earmarking all tax deferrals, the Commission further ordered the Company to include in the deferred tax accounts $1,080,747 representing the sum previously transferred by the Company to unrestricted Earned Surplus when Tennessee and West Virginia discontinued deferred tax accounting in whole or in part. This FPC requirement is in accord with the Commission's Accounts 281 and 282, and we find no error.

Order 204 became effective January 1, 1958. It was to be assumed that as of that date utilities would have property as to which they had used accelerated amortization and liberalized depreciation. In the case of accelerated amortization, Account 281 [8] specified the "account balance" in terms of "amounts applicable * * * for tax purposes." "Tax purposes" is, in turn, unlimited to any particular period of time. Accordingly, if for tax purposes accelerated amortization were used prior to 1958, the accumulated annual provision must be reflected in the account balance as of January 1, 1958.

The same is true with respect to liberalized depreciation.[9] Account 282 specifies the "account balance" in terms of "amounts applicable to the * * *

plant * * * of each vintage year * * * [in respect to which] liberalized depreciation methods * * * have been used * * *." A vintage year is the year in which the particular plant was installed or placed in operation. Therefore, if the vintage year was prior to 1958, the accumulated annual provision is to be reflected in the account balance, as of January 1, 1958.

Consistent with the foregoing, Paragraphs B of Accounts 281 and 282 prescribe methods for determining the "payback" from these accounts so as to balance out and complete the normalization process during all years in which rapid depreciation expense write-offs have been used. To facilitate this, all annual provisions for deferred taxes on income, whenever accumulated, must be reflected in the balances of Accounts 281 and 282. In Cities of Lexington, we agreed with the utilities that provision should be made for pay-backs, for it could not be assumed that the fund would never be needed. In the instant case the pay-back will not take place for some years and, by requiring the use of the Commission's deferred tax accounts in the meantime, the public will be assured that the accumulated deferral will not be paid out to shareholders and the rate payers be called upon to replenish the fund. It would have been incongruous simply to ignore this accumulation and permit its identity to be dissolved in unrestricted Earned Surplus.

7. Appalachian relies on several letters, written by the Commission to various utilities, to support the contention that filing is an absolute prerequisite to the use of the Commission's deferred tax accounts. Each of these letters states, in effect, that a utility may not use the deferred tax accounts until it can show that deferred tax accounting is permissible in any state which regulates it. These letters are not inconsistent with the Commission's present position. They merely show that filing is a means of demonstrating to the Commission that the state regulatory agency permits deferred tax accounting.

8. Account 281, Paragraph C reads: "Records with respect to entries to this account, as described above, and the account balance, shall be so maintained as to show the factors of calculation and the separate amounts applicable to the facilities of each certification or authorization of accelerated amortization for tax purposes. * * *"

9. Account 282, Paragraph C reads: "Records with respect to entries to this account, as described above, and account balance, shall be so maintained as to show the factors of calculation and the separate amounts applicable to the plant additions of each vintage year for each class, group, or unit as to which different liberalized depreciation methods and estimated useful lives have been used. * * *"

For these reasons, we hold that Order 204 does require the Company to use the Commission's deferred tax accounts when reporting to the Commission.[10]

## V. FINANCIAL REPORTING TO STOCKHOLDERS

Most vigorously pressed in this case is the Company's objection to the order that all future accounting statements to stockholders shall conform to the Commission's accounts.[11] As already noted, when the Commission formulated Order 204, it considered various methods of describing tax deferrals. In its view the accounts there prescribed would "assure clear disclosure * * * and lessen the possibilities of misunderstanding and misinterpretation of the nature and purposes of accumulated tax deferrals." 19 F.P.C. 837, 840 (1958). We shall examine the historic and textual supports for these opposing positions.

▪ A. AUTHORITY OF FPC TO REGULATE BASIC CORPORATE ACCOUNTS. We agree with the Commission's determination that it, rather than state agencies, has the power to regulate the basic accounts which a company subject to its jurisdiction must use for financial reporting purposes.

1. *History of Federal Power Act.* Here a short reference to an important chapter in our nation's financial history is desirable. In the years between 1928 and 1935 the Federal Trade Commission made a comprehensive investigation of the public utility industry. Among the abuses the seven-year investigation disclosed were misstatement of earned surplus, or failure to distinguish earned from capital surplus, and making payment of dividends from the latter; deceptive or illusory methods of dividing, or pretending to divide, earnings or profits; deceptive or unsound methods of accounting for assets and liabilities, cost, operating results and earnings.[12]

Noting the frustrations experienced by utility stockholders and others in securing accurate, reliable accounting information concerning holding companies and their operating subsidiaries from stockholder reports and other published financial statements, the Trade Commission reported to Congress that:

"[D]ue to various practices that have unfortunately come into common usage, an investor or other interested party has great difficulty in getting an accurate idea as to the financial condition of a corporation and the success of its operations from the published balance sheets and income statements usually released for the benefit of stockholders * * *.

"Some of the holding and operating companies fail to follow accounting practices that would clearly and

---

10. The Company reasons that, "Form 5," an accounting form required to be submitted monthly by utilities to the FPC, was improperly amended to provide for the deferred tax accounts. Order 204 explicitly amended "Form 1," the form for the annual accounting report, but it is said that the same amendment should have been expressly prescribed for the monthly reports. The argument strikes us as extremely captious and lacking in substance. Common sense inevitably suggests the answer that, if deferred tax accounting is to be reflected in annual reports, the same is expected in the monthly reports.

11. The pertinent part of the Commission's order reads as follows: "(15) It is necessary and appropriate for the purposes of the Federal Power Act and the Com-

mission's Regulations thereunder including the Commission's Uniform System of Accounts: (a) That Appalachian be directed immediately to install and maintain this Commission's Accounts 281, 282, 410 and 411 as an integral part of the basic accounts, prescribed in the Commission's Uniform System of Accounts, by means of which Appalachian's basic financial condition is determined and must be reported, and to consistently and properly observe those Accounts whenever it presents financial data, properly classifiable in those Accounts, in its reports to this Commission or to the general public, including Appalachian's security holders; * * *."

12. Sen.Doc. No. 92, Part 73–A, 70th Cong., 1st Sess., Chap. XIV, p. 62.

properly indicate the nature of surplus shown by the corporate financial statements. *For instance, some companies combine all types of surplus, regardless of its origin, in the general surplus account. The latter is usually supposed to represent only earned surplus, but in many cases it does not.* * * * [Our italics]

"Some companies set up on their balance sheet alleged surplus items. * * * Other deceptions arise from an effort to continuously show earnings for dividend purposes and for use in published statements to influence the investing public. * * *

"It has been found that it is quite a common practice among holding companies to overstate earnings and surplus by recording unrealized earnings * * *." [13]

Noting further how ineffective states had been in their efforts to regulate accounting practices of interstate electric systems, the Federal Trade Commission found that the evils existing in the industry "flourished in spite of such regulation as has existed." [14] The Trade Commission recommended to Congress the enactment of legislation to correct these abuses by the creation of an appropriate federal agency with "power to make and enforce *uniform* accounting * * *." [Our italics] [15] The present Federal Power Act and the Federal Power Commission are the fruit of that investigation.

 2. *Broad Powers Granted to FPC by Act.* In unambiguous language section 301(a) of the Act, 16 U.S.C.A. § 825(a), empowers the Commission to require utilities to keep "accounts, records of cost-accounting procedures, correspondence, memoranda, papers, books, and other records as the Commission may by rules and regulations prescribe as necessary or appropriate for purposes of the administration of this Act, * * *." [16] The burden of justifying any accounting entry is placed squarely on the "person making, authorizing, or requiring such entry * * *."

Section 301(b) provides that the Commission "shall at all times have access to and the right to inspect and examine all accounts, records, and memoranda of licensees and public utilities * * *"; and section 301(c) provides that the Commission shall also have access to the "books, accounts, memoranda, and records of any person who controls, directly or indirectly, a licensee or public utility subject to the jurisdiction of the Commission * * *." [17]

The Company urges that a proviso clause in section 301(a) negatives the Commission's jurisdiction over the Company's reporting of financial data to the general public. We find no support for

---

13. Id., Chap. VII, pp. 513–14.

14. Supra, n. 8, p. 63.

15. Id., 74.

16. Senate Report No. 621, 74th Cong., 1st Sess., accompanying S. 2796 which became Parts II and III of the Federal Power Act, states: "Section 301 (of the Power Act) requires every licensee and every public utility subject to the act to keep its accounts in the manner prescribed by the Commission; it thus takes a long step in the direction of the uniform accounting which is so essential in the electric industry. The authority of the Commission over the accounts of companies under its jurisdiction extends to the entire business of such companies."

17. Also, section 304(a) makes it the duty of every utility to "file with the Commission such annual and other periodic or special reports as the Commission may * * * prescribe * * *." Section 304(b) makes unlawful any willful action "to hinder, delay, or obstruct the making, filing, or keeping of any information, document, report, memorandum, record or account required to be made, filed, or kept under this Act * * *."
Section 309 authorizes the Commission "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act."
Section 311 gives the Commission broad investigatory powers and section 307 grants it subpoena power.

this contention. The clause referred to recites:

"That nothing in this Act shall relieve any public utility from keeping any accounts, memoranda, or records which such public utility may be required to keep by or under authority of the laws of any State."

In numerous cases it has been held that the Commission's accounting is not subordinated if it comes into conflict with state regulatory requirements. Northwestern Electric Co. v. Federal Power Comm., 321 U.S. 119, 64 S.Ct. 451, 88 L.Ed. 596 (1944), affirming 134 F.2d 740 (9th Cir. 1943); Louisville Gas & Electric Co. v. Federal Power Comm., 129 F.2d 126 (6th Cir. 1942); Northern States Power Co. v. Federal Power Comm., 118 F.2d 141 (7th Cir. 1941).[18] It should be noted that the proviso is a prohibition running to public utilities; not to the Commission: "[N]othing in this Act shall relieve any *public utility* from keeping any accounts * * * required * * * by * * * the laws of any State." [Our italics] It was embodied in section 301 to insure that state commissions shall not be precluded from prescribing accounting procedures necessary for their regulation.[19] But as pointed out by Justice Roberts, speaking for a unanimous Supreme Court in the Northwestern Electric case, "We are not here concerned with what the regulatory authorities of [the state] may or may not demand or permit. Whatever that

action may be, it is *subordinate* to Congress' appropriate exercise of the commerce power." 321 U.S. 119, 125, 64 S.Ct. 451, 454, 88 L.Ed. 596 (1944). [Our italics]

Who then is to determine what shall be a regulated utility's basic records and how these records are to be reflected in public financial reports?

It would appear to be a truism that a corporation can have only one set of basic corporate books which reflect its actual financial condition. For as pointed out in Arkansas Power & Light Co. v. Federal Power Comm., 81 U.S.App. D.C. 178, 156 F.2d 821, 823 (1946):

"[A] public utility cannot keep more than one set of actual, official corporate accounts. Neither can any other corporation, for that matter. There must always be an official recording of figures to represent the actualities of the business, to constitute the genuine record of stewardship, the basis upon which representations are made as to the real results of the utility's operations and its true financial condition in reports to stockholders and to the public, and in financial statements to be submitted to prospective investors or creditors. Merely to state this proposition is to demonstrate its soundness, since any reasonable mind immediately perceives that actual transactions can be truly reflected by only one set of figures.

---

18. In the course of the Bill through the House, a proviso to section 318(b) of the Act was adopted to the effect that in respect to the method of keeping accounts, any persons who were subject to state regulatory requirements would not be subject to the requirements of the Act. The proviso, however, was eliminated in Conference. Representative Lea, a member of the House Committee on Interstate and Foreign Commerce, put his objection to the amendment on the following grounds: "It [the amendment] would largely destroy the usefulness of the Federal regulation this bill gives to the Federal Power Commission. We cannot have effective regulation unless we give that Commission the power to get information and give it control over accounts

of these utility companies. It would compel the Federal Government to accept State valuations, made in some instances without adequate information and sometimes in total disregard of the rights of the people of other States whose interest, rates, investors, and consumers are involved." 79 Congressional Record, pp. 10574–10575. Representative Lea's view prevailed.

19. Northern States Power Co. v. Federal Power Comm., 118 F.2d 141, 144 (7th Cir. 1941). ("The system of accounting prescribed by the Commission *does not preclude* accounting regulation by the state body. The act plainly indicates the contrary * * *.") [Our italics]

A differing set shows only a hypothetical situation, demonstrating the distinction between what is, and what might have been.

\* \* \* \* \* \*

"\* \* \* Such alternative accounts are simply in the nature of memoranda, and can never be said to be the official corporate records."

Of course, for certain purposes, such as state rate determinations, it may be deemed advisable by the state regulatory commissions to have accounts stated in a special way. The Federal Power Commission's order does not preclude this as long as differing state accounts are subordinated to and do not obscure the presentation of the accounts prescribed by the Commission.[20]

Here Appalachian argues that it should not be prevented from reporting to stockholders on the basis of the accounts it keeps for state regulatory purposes. But the question immediately arises, which state's requirements? Is a utility which operates in more than one state to have the option of selecting that state's accounting method which best satisfied the utility's desires?

In Arkansas Power & Light Co., 8 F.P.C. 106 (1949), the utility took the bald position that because the Arkansas commission had formulated a set of accounts designated as "official corporate accounts and records," the Federal Power Commission was precluded from establishing its accounts. The Commission held that the proviso to section 301 (a) was not a bar to its actions and that its prescribed accounts constituted the utility's basic books. In upholding the Commission, the Court of Appeals said: "The Federal Power Commission's authority over accounts of its licensees covers basic accounts and does not end where State authority begins." Arkansas Power & Light Co. v. Federal Power Comm., 87 U.S.App.D.C. 385, 185 F.2d 751, 752 (1950), cert. denied, 341 U.S. 909, 71 S.Ct. 621, 95 L.Ed. 1346 (1951).

While the Commission's order in the Arkansas case did not require the utility to report to stockholders, the Commission's opinion made it clear enough that it was asserting jurisdiction over the basic accounts. Also, a specific order as to reports to the public and to stockholders was unnecessary as the utility did not refuse to conform its stockolder reports to Commission requirements.[21]

B. ALLEGED CONFLICT BETWEEN FPC AND SEC. But Appalachian insists that the Commission's action trespasses

20. The opinion of the Commission says: "Accordingly insofar as tax deferrals are concerned, we are ordering that when Appalachian presents its financial data in primary statements of financial condition to stockholders as well as to this Commission, it do so on the basis of the deferred tax accounts we have prescribed. This will not preclude Appalachian, by footnote or otherwise, from including supplementary presentations in those statements or whatever basis may be prescribed by its state regulatory commissions, provided those supplementary presentations are made plainly subordinate to and do not in any way obscure the primary presentation of its condition on the basis of our deferred tax accounting requirements."

See also Northwestern Electric Co. v. Federal Power Comm., 321 U.S. 119, 124–25, 64 S.Ct. 451, 88 L.Ed. 596 (1944), and Alabama Power Co. v. Federal Power Comm., 75 U.S.App.D.C. 315, 128 F.2d 280, 286, cert. denied 317 U.S. 652, 63 S.Ct. 48, 87 L.Ed. 525 (1942). ("If the State, *in the proper performance of its duties*, wishes to require the keeping of a separate set of books no doubt it can do so.") [Our italics]

21. Both the Company and the State of Virginia, which filed a brief amicus curiae, argue that section 204(f) of the Federal Power Act, 16 U.S.C.A. § 824c (f), acts as a bar to the Commission. The section reads: "The provisions of this section [requiring FPC authorization for security issues] shall not extend to a public utility organized and operating in a State under the laws of which its security issues are regulated by a State commission." The statute does not apply to this situation, for the Commission here is not authorizing security issues. The order is merely directed to the use of basic accounts over which, as shown, the Commission has control.

on the jurisdiction of the SEC and for that reason is invalid. We, however, find no conflict in jurisdiction between these two federal agencies. Northwestern Electric Co. v. Federal Power Comm., 321 U.S. 119, 64 S.Ct. 451, 88 L.Ed. 596 (1944).

Under section 318 of the Federal Power Act [22] actual conflicts between the FPC and the SEC are resolved in favor of the SEC. Yet as the Chairman of the SEC has pointed out in a letter addressed to the Solicitor General in connection with the Northwestern case:

"* * * [T]he S.E.C. * * * does sometimes deal with accounting questions in connection with companies which are also subject to F.P.C. jurisdiction. As part of its regulatory activity over security issues and property transactions * * *, the S.E.C. must consider accounting questions incident to its determination of the financial soundness of the proposed transactions and the truthfulness of financial representations to investors.

*"In our view this exercise of accounting jurisdiction is not inconsistent with subsequent or concurrent accounting regulation of the same company by the F.P.C., and does not per se make Sec. 318 applicable."* [Our italics]

The SEC, moreover, does not require utilities to keep their books in accordance with its requirements. By Rule 26 (17 C.F.R. 250.26) the SEC prescribes a uniform system of accounts "for every registered holding company and every subsidiary company thereof" but a company, such as Appalachian, "which derives revenues or income from its own operation of utility assets" is explicitly excepted. In fact, SEC Rule 27 (17 C.F.R. 250.27) specifically authorizes the FPC's uniform system of accounts.

"(a) Every registered holding company, and subsidiary thereof, which is a public utility company and which is not required by either the Federal Power Commission or a State commission to conform to a classification of accounts, *shall keep its accounts, insofar as it is an electric utility company, in the manner currently prescribed for similar companies by the Federal Power Commission * * *.*" [Our italics]

What the SEC does demand of utilities is that they fully disclose the facts in their accounting. Normally as long as there is fair and adequate disclosure of the accounting conventions underlying a utility's published accounting statements, those statements will be acceptable to the SEC. This is made clear by Rule 28.

"Except as otherwise authorized or required by the Commission by rule, regulation, order, statement of administrative policy, or otherwise, no registered holding company or subsidiary company thereof shall distribute to its security holders, or publish, financial statements which are inconsistent with the book accounts of such company or financial statements filed with this Commission by, or on behalf of, such company * * *."

Before 1960 this rule was mandatory. In that year Accounting Series, Release No. 85 (Holding Company Act, Release No. 14173), issued concurrently with amended Rule 28, explained that the amendment was necessary to avoid misunderstanding arising from the use of certain state methods of disclosing deferred taxes. The release reiterated the SEC's "responsibility to require that the

22. Section 318 reads: "If, with respect to the issue, sale, or guaranty of a security, or assumption of obligation or liability in respect of a security, the method of keeping accounts, the filing of reports, or the acquisition or disposition of any security, capital assets, facilities, or any other subject matter, any person is subject both to a requirement of the Public Utility Holding Company Act of 1935 or of a rule, regulation, or order thereunder and to a requirement of this Act or of a rule, regulation, or order thereunder, the requirement of the Public Utility Holding Company Act of 1935 shall apply to such person, and such person shall not be subject to the requirement of this Act * * *."

financial statements filed with it be prepared in a manner which provides adequate and fair disclosure." The Commission was of the opinion, however, that it was improper to include in the surplus accounts (even as "restricted surplus") provisions for deferred taxes, notwithstanding the approval of state commissions to such labeling.[23] Accordingly the SEC ordered that:

"[A]ny financial statement filed with this Commission which designates as earned surplus (or its equivalent) or in any manner as a part of equity capital (even though accompanied by words of limitation such as 'restricted' or 'appropriated') the accumulated credit arising from accounting for reductions in income taxes resulting from deducting costs for income tax purposes at a more rapid rate than for financial statement purposes will be presumed by the Commission to be misleading or inaccurate despite disclosure contained in the certificate of the accountant or in footnotes to the statements, provided the amounts involved are material."

The accounting release explicitly approved the balance sheet captions and classification of deferred taxes prescribed by the Federal Power Commission in its Order 204.

Appalachian asserts that as a member, along with Kentucky Power Company, of the American Electric Power Company system, it (Appalachian) was authorized by the SEC in the Kentucky Power Company case [24] to describe deferred tax accounting in a manner different from the FPC account captions. On this basis Appalachian contends that it comes within the exception of Rule 28. We disagree.

In the Kentucky Power case, the SEC disapproved of that company's use of the caption "Earned Surplus Restricted for Future Federal Income Taxes" because that caption contravened the requirements of Accounting Series, Release No. 85.[25] The utility then proposed an alternative caption which the Commission accepted.

The Kentucky Power decision was announced by the SEC January 13, 1961. It there noted that the FPC had initiated proceedings against Appalachian, Kentucky's sister subsidiary in the American Electric Power Company system. The SEC's approval of the proposed caption was not made directly applicable to Appalachian. Subsequent to the Kentucky Power case, the SEC accepted from Appalachian financial statements which included the Kentucky Power style captions. However, we do not think that such acceptance was the "authorization" envisioned by Rule 28 to permit deviation from basic book accounts. The SEC was merely indicating its willingness to accept the Kentucky Power style captions in the absence of FPC required accounts.

The SEC has expressly approved of the FPC accounts in general and Accounts 281 and 282 in particular. By its rules,

23. Appalachian unsuccessfully sought to enjoin the American Institute of Certified Accountants from notifying its membership that the Institute's Committee on Accounting Procedure was of the opinion that accumulated taxes deferred under sections 167 and 168 should not be shown as "a credit to earned surplus or to any other account included in the stockholders' equity section of the balance sheet." Appalachian Power Company v. American Institute of Certified Public Accountants, 177 F.Supp. 345 (S.D.N.Y.1959); aff'd per curiam, 268 F.2d 844 (2d Cir.); cert. denied, 361 U.S. 887, 80 S.Ct. 158, 4 L.Ed.2d 121 (1959).

24. Holding Company Act, Release No. 14353.

25. It is noted with interest that the Kentucky Power Company, represented by the same counsel as the Appalachian Power Company in the instant case, maintained in the Kentucky Power case before the SEC (inconsistently with what is now being argued) that the SEC lacked authority to prescribe the form of accounting statements because the FPC had that power. In its answer before the SEC, the Kentucky Power Company insisted that the proposed SEC action was invalid because "it is inconsistent with accounting requirements imposed by the Federal Power Commission * * *."

the SEC requires utilities to use their basic accounts except where otherwise authorized, and we have shown that this exception was included to permit the SEC to prevent perpetuation of what it considers improper accounting. As the SEC has not "authorized" Appalachian to deviate from its basic books as prescribed by the FPC, but, on the contrary, has demonstrated its approval of the FPC's accounting requirements, Appalachian is obliged to use the FPC's accounts in its reports to the public.

The absence of any conflict between the FPC and the SEC, demonstrated in the above SEC pronouncements, is well illustrated by the experience of the Atlantic City Electric Company. In 1962 Atlantic City filed a prospectus using the Kentucky Power style caption which the SEC accepted. In 1963 it filed a prospectus using the FPC captions. This too the SEC accepted.

In sum, the effort to discover an incompatability between the two governmental agencies must fail. The SEC does not in this litigation nor has it in any analogous context intimated such a conflict with the FPC. It has, in fact, repeatedly expressed a diametrically opposite view. The dilemma posed by Appalachian does not exist.

■ C. IMPACT ON BORROWING POWER. The suggestion is advanced that, were it relieved of the obligation imposed by the Order, Appalachian would be enabled to present a more favorable financial appearance and borrow funds more advantageously. This loses sight of the important historic fact that one of the abuses complained of in the Federal Trade Commission report leading to the creation of FPC was precisely that figures were being manipulated in order to enhance acceptance of securities by the lending public. The argument resting on the effect upon the borrowing power does not justify setting the Order aside. As the Commission's action is otherwise proper, it is immaterial that the Order may have this effect.

## VI. CONCLUSION

Congress, having the general power of regulation, has designated the FPC, which has the capacity and the opportunity to develop the necessary knowledge and expertness to prescribe a coherent and detailed system of regulation. It is no answer therefore to say that there is no specific legislation investing the FPC with authority to insist that the data it requires to be filed with it shall also be used by the utility in addressing its stockholders and the market. When the utility lodges the required accounts with the Commission, the Commission is then not obliged to look aside while the utility disseminates to the most interested segments of the public, consisting of investors, actual or potential, information at odds or susceptible of being interpreted as at odds with those accounts. The power claimed by the FPC is not in excess of the statutory grant and its exercise involves no hardship to Appalachian and no loss of any advantages to which it is entitled.

By requiring utility stockholder reports to conform to Federal Power Commission accounting procedures, the Order under review insures that a utility's accounts will see "the light of day." Arkansas Power & Light Co., 8 F.P.C. 106 (1949). "[T]he broad general purposes of the Act * * * clearly contemplated not only the protection of the public interest generally, but likewise the interest of the consumer and the investor." Louisville Gas & Electric Co. v. Federal Power Comm., 129 F.2d 126, 133 (6th Cir.1942). The Act's legislative history, plus the broad powers entrusted to the Commission make it abundantly clear that the Commission has here satisfied the congressional purpose.

Viewed at large or in its particular application to Appalachian, we do not find the Order deficient. The petition for review is

Dismissed.